IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| AMY FYFFE, | ) | Case No. 1:21-cv-332 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

Plaintiff, Amy Fyffe, suffers from fibromyalgia, which formed part of the basis for her application for disability insurance benefits ("DIB") in 2014.  The Commissioner of Social Security denied Fyffe's application, and she came to this court seeking judicial review of the Administrative Law Judge's ("ALJ") negative findings.  Fyffe challenged the ALJ's evaluation of the opinion of her treating physician, Kermit Fox, MD, and her subjective symptom complaints.  Judge James S. Gwin vacated and remanded the ALJ's decision, determining that the ALJ failed to give "good reasons" for giving less than controlling weight to Dr. Fox's opinion on the limiting effects of Fyffe's fibromyalgia.

On remand, the Commissioner again denied Fyffe's application.  Fyffe now seeks judicial review of the ALJ's negative findings on remand, contending that the ALJ again misevaluated fibromyalgia symptom complaints and Dr. Fox's opinion.  Fyffe's arguments have merit.  Because the ALJ failed to apply proper legal standards in his evaluation of Fyffe's fibromyalgia

symptoms and Dr. Fox's opinion, the Commissioner's final decision denying Fyffe's application for DIB must be vacated and Fyffe's case must be remanded for further consideration.

## I.    Procedural History

On October 31, 2014, Fyffe applied for DIB.  (Tr. 361).[1]  Fyffe alleged that she became disabled on January 1, 2013 due to: 1. fibromyalgia; 2. arthritis; 3. degenerative joint disease in her knee and lumbar spine; 4. migraines; 5. colitis; and spondylolisthesis of the lumbar region. (Tr. 361, 436).  The Social Security Administration ("SSA") denied Fyffe's application initially and upon reconsideration.  (Tr. 279-86, 288-96).  ALJ Joseph G. Hajjar heard Fyffe's case on August 10, 2016, at which Fyffe stated she intended to amend the onset date to January 31, 2014, and denied her application in an October 24, 2016 decision.  (Tr. 12-24, 251-78).  On October 17, 2017, the Appeals Council denied further review.  (Tr. 1-3).  On March 8, 2019, Judge Gwin remanded Fyffe's case to the Commissioner for further proceedings.  (Tr. 1441-65).

On June 6, 2019, the Appeals Council vacated the ALJ's 2016 decision denying Fyffe's claim and remanded the case to the ALJ for further consideration.  (Tr. 1466-70).  The ALJ held another hearing on Fyffe's case on December 4, 2019 and denied the claim on February 4, 2020. (Tr. 1343-63, 1372-94).  In doing so, the ALJ determined at Step Four of the sequential evaluation process that Fyffe had the residual functional capacity ("RFC") to perform light work, except that she could "never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; occasionally balance and stoop; never kneel, crouch or crawl; and occasionally work at unprotected heights."  (Tr. 1350).

Based on vocational expert testimony that someone with Fyffe's age, experience, and RFC could perform her past relevant work as a leasing agent, as well as other work, the ALJ

---

[1] The administrative transcript appears in ECF Doc. 10 (Tr. 1-716), ECF Doc. 10-1 (Tr. 707-1306), ECF Doc. 10-2 (Tr. 1307-1982), and ECF Doc. 10-3 (Tr. 1983-93).

denied Fyffe's application.  (Tr. 1361-63).  On December 7, 2020, the Appeals Council declined

further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1333-

36).  On February 10, 2021, Fyffe filed a complaint to obtain judicial review.[2]  ECF Doc. 1.

## II.   Evidence

### A.     Personal, Educational, and Vocational Evidence

Fyffe was born on September 20, 1973 and was 39 years old on the alleged onset date.

(Tr. 361).  Her date last insured was June 30, 2021.  (Tr. 1345).  Fyffe had a high school

education, with one year of college education.  (Tr. 437).  Fyffe's work history included:

(i) machine operator from 1998 through January 2013 (37.5 hours per week); (ii) leasing agent

from 2009 through May 2015 (between 15 and 25 hours per week); (iii) art teacher from 2012 to

2013 (12 hours per week); and (iv) veterinarian technician at a cat shelter from October 2017 to

the date of the ALJ hearing (between 23 and 25 hours per week).  (Tr. 262-63, 437, 1378-80).

Fyffe's treatment notes repeatedly indicated that she worked full-time as a machine operator

between September 2015 and May 2018.  (Tr. 1118, 1142, 1181, 1193, 1217, 1804, 1817, 1825,

1838).

### B.     Relevant Medical Evidence

Because the focus of Fyffe's arguments is the ALJ's consideration of her fibromyalgia

and the opinion evidence of the impact of her fibromyalgia on her ability to work, the court will

summarize only the medical evidence relevant to Fyffe's fibromyalgia.

Fyffe has a medical history of fibromyalgia, for which she had been receiving treatment

from Kermit Fox, MD, at The MetroHealth System ("MetroHealth") since late 2012.  (Tr. 533

("Recall" section documenting Fyffe's initial encounter with Dr. Fox)).  Fyffe's primary

---

[2] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and the parties consented to my
jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 11.

symptoms were lower back pain, and her treatment consisted of home excise and medication (Neurontin, Flexeril, and Ultram). *Id.*

On February 4, 2013, Fyffe visited to Dr. Fox for a follow up, reporting that she no longer had lower back pain. *Id.* Fyffe reported improvement with Neurontin and that she was doing home exercises daily. *Id.* When she had pain, she had partial relief with Tramadol, which she required only once per week. *Id.* Fyffe reported her current difficulty as motivation to get out of bed and exercise. *Id.* Fyffe also reported that "[s]he quit her second job recently [but] continues to teach." *Id.* On physical examination, Fyffe had: (i) minor pain with spine flexion; (ii) right-sided back pain with straight leg raise; and (iii) 5/18 positive trigger points. (Tr. 535-36).

On April 22 and June 10, 2013, Fyffe continued to report no back pain, that she was teaching, and that she was doing daily home exercises. (Tr. 527, 521). She also reported daily walks, that she got a new bicycle and a dog, and that she reduced her Neurontin dosage by half. *Id.* On physical examination, Fyffe had results similar to her previous visit except she also had tenderness over the left iliotibial ("IT") band. (Tr. 524, 530).

On September 9, 2013, Fyffe reported "minimal" low back pain and that she was taking Tramadol two to three times per week for breakthrough pain. (Tr. 516). She also reported that she continued to teach, do home exercises "almost daily," walk daily, and use her bike. *Id.* On physical examination, Fyffe had: (i) right-sided back pain with straight leg raise; (ii) mild edema to the left IT band with concordant pain to palpation; and (iii) positive Ober's test. (Tr. 519).

On January 27, 2014, Fyffe reported to Dr. Fox no pain but stated that she had breakthrough pain twice per week. (Tr. 496). She continued to do home exercises and walk daily, as well as use her bike. *Id.* On physical examination, Fyffe had: (i) minor back pain with

4

flexion; (ii) right-sided back pain with straight leg raise; and (iii) 3/18 positive trigger points. (Tr. 499).

On September 10, 2014, Fyffe reported that her fibromyalgia had been "really difficult of late," stating that her pain was 9/10 in intensity. (Tr. 565-66). Fyffe reported that she was taking Tramadol three times per day for the pain, she was not sleeping, and she continued exercising but with difficulty. (Tr. 566). Fyffe also reported that her employer had told her they were no longer offering her position full time. *Id.* On physical examination, Fyffe had results similar to her last visit, except she had 18/18 positive trigger points. (Tr. 569). Dr. Fox replaced Tramadol with Topamax, noting that it was possible opiates had contributed to a relapse in her fibromyalgia symptoms. (Tr. 570).

On December 2, 2014, Fyffe reported that Topamax was not helping her fibromyalgia, the pain of which she rated at 8/10 in intensity. (Tr. 559). Fyffe stated that she was taking Flexeril twice per week for the pain. *Id.* On physical examination, she had results similar to her previous visit, including 18/18 positive trigger points. (Tr. 562). Dr. Fox prescribed Vicodin for breakthrough pain. (Tr. 563).

On February 3, 2015, Fyffe reported that her pain had improved, which she attributed to more regular exercise, but that she was still concerned with fatigue. (Tr. 924). Fyffe stated that most of her pain was in her low back, which she rated at 7/10 in intensity, with radiation into her buttocks. *Id.* Fyffe reported that she had taken ten Vicodin in the preceding two months and Flexeril about twice per week. (Tr. 925). On physical examination, Fyffe had: (i) tenderness in the lumbosacral paraspinals; (ii) minor back pain with flexion; (iii) right-sided back pain with straight leg raise; and (iv) 13/18 positive trigger points. (Tr. 928). Dr. Fox stated that Fyffe's fibromyalgia was "controlled with Neurontin and home exercise program" and improved since

being weaned off opiates.  (Tr. 929).  For her back pain, Dr. Fox administered a transforaminal epidural steroid injection.  *Id.*

On June 8, 2015, Fyffe reported that she'd had 50% relief from the injection but that her pain had flared up after she fell on the sidewalk and bumped her knee.  (Tr. 1253).  She reported her pain as 10/10 in intensity and reported continued concerns over fatigue.  *Id.*  However, she attributed her worsening pain to a "relay for life" she participated in the day before.  *Id.*  Fyffe stated that she was taking Flexeril about twice per week.  *Id.*  On physical examination, Fyffe had similar results to her previous visit except she had 15/18 positive trigger points.  (Tr. 1256).  Dr. Fox administered another transforaminal epidural steroid injection.  (Tr. 1257).

On September 1, 2015, Fyffe reported that her fibromyalgia pain was "stable" but that her back pain was worse.  (Tr. 1215).  She reported continued fatigue, stating that after waking up at 7:00 a.m. she'd need to take a nap at noon, which interfered with her life.  *Id.*  She stated that she found it difficult to paint, such that it took longer for her to complete her projects.  *Id.*  Fyffe further reported 50% improvement in her back pain with injection.  (Tr. 1215-16).  On physical examination, Fyffe had: (i) multiple soft tender points and spasms in the upper trapezius; (ii) tenderness over the posterior superior iliac spine, sacroiliac joint, and buttocks; (iii) positive straight left leg raise test; and (iv) multiple tender points through the trunk.  (Tr. 1218-19).  Dr. Fox noted that Fyffe's pain increased in severity again.  (Tr. 1220).  Dr. Fox doubled the dosage of Neurontin and prescribed Robaxin.  *Id.*  He also administered another injection.  *Id.*

On October 14, 2015, Fyffe received two additional transforaminal epidural steroid injections.  (Tr. 1199).

On November 3, 2015, Fyffe reported 75% relief with the two most recent injections.  (Tr. 1190).  Fyffe reported that she had started going to the gym two to three times per week:

(a) using the treadmill and weight machines and (b) doing lat pull downs, sit-ups, and crunches. *Id.* And she reported neck pain and stiffness, which she rated at 4/10 in intensity. *Id.* On physical examination, Fyffe had: (i) spasm in the upper trapezius; (ii) paresthesia in the neck upon palpation of the left great occipital nerve; (iii) mildly decreased upper extremity range of motion; (iv) paraspinal spasm; (v) pain down the back of her left leg with extension and left rotation; (vi) 12/18 positive trigger points; and (vii) pain to palpation over the left ribs. (Tr. 1193-94). Dr. Fox replaced Fyffe's Neurontin with Lyrica. (Tr. 1195).

On December 15, 2015, Fyffe reported continued neck pain and stiffness, which she rated at 8/10 in intensity. (TR. 1179-80). She reported hand numbness, which she stated had been present for "many months." (Tr. 1180). She reported that her pain was not responsive to Lyrica, though she still went to the gym two to three times per week and did daily home exercises for her neck and back. *Id.* On physical examination, Fyffe had similar results to her last visit except she had: (i) positive Tinel's sign test; and (ii) 14/18 positive trigger points. (Tr. 1183). Dr. Fox administered another transforaminal epidural steroid injection, increased Fyffe's Lyrica dosage, ordered an electrodiagnostic study, and recommended physical therapy for cervical spine myofascial pain. (Tr. 1184-86).

On February 16, 2016, Fyffe reported "minimal" relief from her most recent injection and new onset of pain in her buttocks radiating down her thighs. (Tr. 1139). She also reported improvement in her body sensitivity with Lyrica, such that she could enjoy showers. *Id.* Robaxin, however, was not helping as much as Flexeril did for spasms. *Id.* Fyffe reported her pain at 5/10 in intensity. *Id.* On physical examination, Fyffe had: (i) spasm in the upper trapezius; (ii) mildly decreased upper extremity range of motion; (iii) tenderness over the superior sacral sulcus; (iv) minimal paraspinal spasm; and (v) pain radiating down the back of

her left leg with extension and rotation.  (Tr. 1142-43).  Dr. Fox replaced Robaxin with Zanaflex and prescribed Vicodin for breakthrough pain and topical lidocaine.  (Tr. 1144).

On April 19, 2016, Fyffe reported continued pain in her buttocks radiating into her thighs, which she rated at 5/10 in intensity.  (Tr. 1115).  She reported that Zanaflex was working but made her "very tired."  *Id.*  She had taken ten Vicodin over the previous three weeks.  *Id.* She also reported that she completed nine physical therapy visits for her neck.  *Id.*  On physical examination, Fyffe had similar results to her previous visit.  (Tr. 1118-19).

On July 11, 2016, Fyffe reported continued back pain, which now radiated into her calves.  (Tr. 1080-81).  She stated that Lyrica had helped her muscle fatigue, which now only occurred when she overexerted herself.  (Tr. 1081).  However, she reported "feeling especially fatigued during the day over the past few weeks."  (Tr. 1081).  She also reported doing stretches at the gym.  *Id.*  On physical examination, Fyffe had: (i) tenderness to palpation of the lumbar paraspinals and PSIS; and (ii) minimal paraspinal spasm.  (Tr. 1084).  Dr. Fox noted that Fyffe's neck pain had only been minimally improved with physical therapy.  (Tr. 1086).

On December 5, 2016, Fyffe reported that she had a flare-up in her pain overnight, which she described as a whole-body spasm.  (Tr. 1591).  Fyffe reported her pain at 9/10 in intensity. (Tr. 1591).  Fyffe reported that she might be hypoglycemic and had experienced feelings of dizziness and a syncopal episode.  (Tr. 1592).  And she reported that she hired a personal trainer to prepare a diet and exercise plan.  *Id.*  On physical examination, Fyffe had results similar to her previous visit, except she had moderately decreased lumbar spine range of motion.  (Tr. 1595). Dr. Fox referred Fyffe to neurosurgery and increased the number of Vicodin pills for breakthrough pain.  (Tr. 1599).

On January 13, 2017, Fyffe visited Jonathan Belding, MD, reporting back and leg pain. (Tr. 1609). She also reported endurance fatigue of her back, as she was no longer able to stand up straight, do dishes, or do laundry. *Id.* On physical examination, Fyffe had a positive straight leg raise test, extension-type pain in the lower spine, and an inability to stand with a level pelvis. (Tr. 1610). Dr. Belding determined that Fyffe had failed nonoperative treatment and recommended surgery, which Fyffe underwent on February 23, 2017. (Tr. 1610, 1642).

On April 5, 2017, Fyffe reported to Dr. Belding that she felt "quite good" and "much improved in terms of her leg pain." (Tr. 1741). She stated that she was going to school and planned on going on a trip soon, so she needed to refill her pain medications. *Id.* Fyffe also stated that she would be lifting up to 15 pounds despite being on a restriction of no more than 10 pounds. *Id.*

On May 17, 2017, Fyffe reported to Dr. Belding that her leg pain was gone. (Tr. 1744). However, she continued to have back pain, which she treated with Percocet. *Id.* Fyffe stated that she was "back to full activities," and Dr. Belding lifted her restrictions. *Id.*

On June 28, 2017, Fyffe reported to Dr. Belding that she had no leg pain but that she had increased back pain after falling off her bed. (Tr. 1757). Dr. Belding instructed Fyffe to work with Dr. Fox and physical therapy going forward. *Id.* On August 16, 2017, Fyffe reported to Dr. Belding that her back occasionally bothered her when she did too much but was otherwise doing "pretty well." (Tr. 1764).

On November 20, 2017, Fyffe returned to Dr. Fox, reporting that she'd been more active since her surgery, which had caused her pain to worsen. (Tr. 1791). Fyffe reported pain in the piriformis region, which she rated at 7/10 in intensity. *Id.* Fyffe reported that her pain was worsened after a workday. *Id.* She stated that her back pain had resolved. *Id.* On physical

9

examination, Fyffe had similar results to her previous visit, except that she also had positive pelvic distraction, sacral thrust, and hip hyperextension. (Tr. 1796). Dr. Fox ordered physical therapy. (Tr. 1800).

On March 21 and 22, 2018, Fyffe visited Jillian Stephen, APRN-CNP, reporting continued pain in her lower back and piriformis that was not being alleviated with Tramadol. (Tr. 1815, 1823-24). Fyffe reported that she continued to work as a veterinarian technician and remained active in spite of the pain, doing daily exercises and stretches. *Id.* On physical examination, Fyffe had: (i) tenderness of the right segmental lumbosacral junction and over the right greater trochanter; (ii) minimal paraspinal spasm; (iii) moderately decreased lumbar spine range of motion with extension; and (iv) pain with facet loading. (Tr. 1819-20, 1827-28). Nurse Practitioner Stephen prescribed Norco for pain and discontinued Tramadol. (Tr. 1823, 1831).

On April 27, 2018, Dr. Fox administered a medial branch block. (Tr. 1833).

On May 30, 2018, Fyffe reported to Nurse Practitioner Stephen that she had received "excellent" relief with a medial branch block, which lasted one week. (Tr. 1836). Fyffe reported low back pain rated between 6-8/10 in intensity. *Id.* On physical examination, her results were similar to her previous visit. (Tr. 1840-41).

On June 20, 2018, Dr. Fox administered a second medial branch block. (Tr. 1850). Chong Kim, MD, administered a third medial branch block on August 22, 2018. (Tr. 1853).

On September 10, 2018, Fyffe returned to Nurse Practitioner Stephen, reporting low back pain rated at 5/10 in intensity and fibromyalgia pain rated at 9/10 in intensity. (Tr. 1856). Fyffe reported that she had started aquatic therapy, swimming, and some strength training. *Id.* She also reported that she had been abusing Norco. *Id.* On physical examination, Fyffe appeared in

10

moderate distress.  (Tr. 1859-60).  Nurse Practitioner Stephen replaced Norco with Cymbalta and indicated that she would no longer prescribe opiates.  (Tr. 1860).

On September 12, 2018, Dr. Kim administered a fourth medial branch block.  (Tr. 1862).

On September 24, 2018, Fyffe reported to Nurse Practitioner Stephen that her lower back pain was 7/10 in intensity.  (Tr. 1865).  Fyffe stated that her legs also hurt, but it could have been from volunteering at her church painting, which involved going up and down a ladder and stooping.  *Id.*  She also reported doing tai chi in the morning before work, occasional swimming, and strength training three days per week.  *Id.*  On physical examination, Fyffe appeared in moderate distress.  (Tr. 1868).

On December 26, 2018, Fyffe reported to Nurse Practitioner Stephen that everything was going well until three weeks before the appointment, when her left hip started hurting.  (Tr. 1873).  She rated her pain at 9/10 in intensity and was using a cane.  *Id.*  Fyffe stated that she had stopped exercise and stretching because of the severity of the pain.  *Id.*  On physical examination, Fyffe had: (i) left hip tenderness; (ii) antalgic gait; and (iii) positive Patrick's and Scour tests.  (Tr. 1876-77).  A hip x-ray was unremarkable.  (Tr. 1878).

On March 18, 2019, Fyffe visited Lisa Toth, APRN-CNP, reporting fatigue.  (Tr. 1880). Fyffe stated that her fatigue had been present "for a few months" and that she woke up exhausted.  *Id.*  She also reported myalgias, joint pain, and joint swelling.  (Tr. 1882).  Nurse Practitioner Toth ordered lab tests and refilled Fyffe's medication.  (Tr. 1884).

On May 6, 2019, Fyffe visited Dr. Kim, reporting pain she described as "overall stable" on Lyrica and Zanaflex, but which worsened at night.  (Tr. 1886).  On physical examination, Fyffe had: (i) limited neck and lumbar range of motion; and (ii) minimal thoracic tenderness. (Tr. 1890).  Dr. Kim refilled Fyffe's medication.  *Id.*

On November 1, 2019, Fyffe returned to Nurse Practitioner Toth, reporting that she recently had a fibromyalgia flare-up and had called off from work twice.  (Tr. 1976).  Fyffe stated she believed the cold weather made her feel worse.  *Id.*  On physical examination, Fyffe had results similar to her pervious visit.  (Tr. 1980).

### C.    Relevant Opinion Evidence

#### 1.    Treating Source, Kermit Fox, MD

On May 19, 2016, Dr. Fox wrote an opinion on Fyffe's functional limitations stemming from her fibromyalgia.  (Tr. 1060).  Dr. Fox opined that:

> The chronic pain and fatigue can be debilitating at times.  She has good and bad days, which is normal for fibromyalgia.  I find Amy's complaints of pain and fatigue credible and consistent with her underlying condition, without exaggeration.
>
> In terms of a work setting, I believe it would be difficult for Amy to hold down full-time employment.  I suspect she would miss at least 3-4 days per month due to her chronic pain.  She would be unable to tell her employer in advance which days she would miss due to the unpredictable nature of her medical condition.  On better days, if Amy were to make it into work, I would expect that her pain levels would be high and would worsen as they day progressed.  This would affect her ability to concentrate on her job duties and lead to her being off track and not effectively finishing the task at hand.

*Id.*

#### 2.    State Agency Consultants

On January 23, 2015, Gerald Klyop, MD, evaluated Fyffe's physical capacity based on a review of the medical record and determined that Fyffe could perform light work.  (Tr. 283-85).  Specifically, Dr. Klyop determined that Fyffe could: (i) lift 20 pounds occasionally and 10 pounds frequently; (ii) sit/stand/walk 6 hours in an 8-hour workday; (iii) occasionally balance, stoop, and climb ramps/stairs; and (iv) never kneel, crouch, crawl, or climb

ladders/ropes/scaffolds.  (Tr. 283-84).  On May 20, 2015, Esberdado Villanueva, MD, concurred

with Dr. Klyop's assessment.  (Tr. 293-95).

   D.   **Relevant Testimonial Evidence**

       1.   **2016 Hearing**

At the August 10, 2016 hearing, Fyffe testified that she had been living with her parents

since 2012.  (Tr. 258).  She had a dog, two cats, a turtle, and a parakeet, all of which she cared

for with the assistance of her father.  *Id.*

Fyffe testified that she last worked in 2015 as an office clerk for her friend's cleaning

company.  (Tr. 259-60).  Fyffe stated that she only worked there for a "couple of months"

because the company failed.  (Tr. 260).  Fyffe stated that she did not think she could have

continued working for her friend's company long term because of her "fibro-fog:" confusion,

difficulty concentration, and forgetfulness.  (Tr. 260-61).  She experienced fibro-fog two to three

times per week.  (Tr. 261).

Fyffe testified that before working as an office clerk she worked part-time (19 to 25

hours) as a leasing agent through May 2015.  (Tr. 261-63).  Before that she worked 15 years as a

machine operator.  (Tr. 263).

Fyffe testified that what prevented her from working was tingling in her hands, which

caused her to drop things, and back pain.  (Tr. 264-65).  Fyffe rated her pain to be 5/10 in

intensity.  (Tr. 265).  She stated that 2 to 3 times per month her pain would worsen to the point

when she could not leave her room for up to 48 hours.  *Id.*  She also had neck pain that radiated

into her shoulders and affected her ability to do repetitive tasks, reach, grab, and manipulate

objects.  (Tr. 269-70).

Fyffe testified that she did what she could to help around the house but got easily exhausted by showering and preparing dinner.  (Tr. 267).  On an average day, she took a two-hour nap at 10:00 a.m. because of her low energy.  (Tr. 270).  She did what she could with the animals, such as walk the dog, but she could not guarantee doing so every day.  *Id.*  She also made coffee in the morning and made breakfast for her family.  (Tr. 267-68).  She sometimes grocery shopped with her father.  *Id.*  She did stretches, but the stretches caused muscle spasms. (Tr. 268).

Vocational expert ("VE") Michael Klein testified that someone with Fyffe's age, education, and experience; limited to light work; and who could occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, occasionally balance and stoop, never kneel, crouch, or crawl, and occasionally be exposed to unprotected heights, could work as a leasing agent.  (Tr. 273-74).  The VE testified that his answer would not change if the individual were further limited to frequent handling, fingering, and feeling.  (Tr. 276).  The VE testified an employer would not tolerate more than one absence per month.  (Tr. 277).

### 2.    2019 Hearing

At the December 4, 2019 hearing, Fyffe testified that since October 2017 she worked part-time (23 to 25 hours per week, 3 to 3.5 hours per day, 5 days per week) at a cat shelter.  (Tr. 1377-78).  Her duties included cleaning, mopping, and carrying cat litter, which weighed between 15 and 20 pounds.  (Tr. 1378, 1383).  She could work more hours but was physically unable to.  (Tr. 1379, 1383-84).  She denied working anywhere since the previous hearing, stating that she stopped working as a machine operator in 2014.  (Tr. 1379).

Fyffe testified that performing work at the shelter had become increasingly difficult.  (Tr. 1380).  She asked for time off work because of her chronic pain at least once per week and on

14

average three days per month.  (Tr. 1382-83).  She received assistance from coworkers on bad days to carry heavy items.  (Tr. 1383-85).  And she sometimes took an additional break because of exhaustion.  (Tr. 1384).

Fyffe testified that her fibromyalgia had worsened since the previous hearing, which she described as a constant flu.  (Tr. 1386).  Because of her fatigue, she was sometimes slow at work, which her boss would say something about come pay day.  (Tr. 1388).  Fyffe had noticed her boss "put out that she's hiring" for Fyffe's position.  (Tr. 1389-90).  Fyffe also described difficulties griping and cramps in her arms with sweeping and mopping.  (Tr. 1389).

Fyffe testified that on a typical day she would wake up, go to work, and come home to sleep and stay in bed the rest of the day.  (Tr. 1381).  On her day off, she did some cleaning around the house.  *Id.*  She did not do laundry or grocery shop.  (Tr. 1382).

VE Deborah Lee testified consistently with the previous VE's testimony.  (Tr. 1388, 1390-91, 1392).  The VE testified that if the hypothetical were restricted to occasional reach, the individual could not perform any of the jobs the VE testified to.  (Tr. 1392-93).

The same day of the hearing, Fyffe's boss, Beth Pearce, wrote a letter regarding Fyffe's work at the cat shelter.  (Tr. 1370).  Pearce stated that Fyffe called off work "quite a bit" because of "Fibro flare-ups, car troubles, cold, flu and a swollen foot."  *Id.*

## III.    Law & Analysis

### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.

15

*Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And, even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Jones*, 336 F.3d at 477); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'").  But, even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

### B.    Subjective Symptom Complaints

Fyffe argues that the ALJ failed to apply proper legal standards or reach a decision supported by substantial evidence in his analysis of her fibromyalgia symptom complaints.  ECF Doc. 13 at 11-16.  Fyffe argues that: (i) the ALJ's reliance on her activities of daily living lacked logical coherence; (ii) the ALJ failed to address her difficulties in sustaining even part-time work; (iii) the ALJ should not have used her exercise to undermine her subjective symptom

complaints, when that was part of her treatment; (iv) the exhibits the ALJ relied upon did not support his conclusion that objective exam findings contradicted the severity of her alleged symptoms; and (v) the ALJ could not rely on unremarkable objective exam findings. *Id.*

The Commissioner disagrees, arguing that the ALJ applied SSR 12-2p and reasonably determined that Fyffe's subjective symptom complaints were inconsistent with the longitudinal record. ECF Doc. 15 at 5-8. The Commissioner further argues that Fyffe has not proposed any additional limitations that should have been included in the RFC. ECF Doc. 15 at 5.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(e). The RFC is an assessment of a claimant's ability to do work despite her impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5, at *14. And in the case of fibromyalgia, the ALJ must "consider a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'" SSR 12-2p, 2012 SSR LEXIS 1, at *17 (July 25, 2012).

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms. *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989). This is more difficult in the case of fibromyalgia, which is characterized by the lack of "objectively alarming signs." *Rogers*, 486 F.3d at 243; *see Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003) (noting that, due to the "elusive" and "mysterious" nature of fibromyalgia, medical evidence confirming the alleged

severity of the impairment almost never exists).  Nevertheless, as with other impairments, the

lack of corroborating medical evidence is not on its own dispositive of the severity of a

claimant's impairments.  SSR 12-2p, 2012 SSR LEXIS 1, at *14; SSR 16-3p, 2016 SSR LEXIS

4, at *12-13.  In such cases, the ALJ must:

> consider all of the evidence in the record, including the person's daily activities,
> medications or other treatments the person uses, or has used, to alleviate
> symptoms; the nature and frequency of the person's attempts to obtain medical
> treatment for symptoms; and statements by other people about the person's
> symptoms.

SSR 12-2p, 2012 SSR LEXIS 1, at *14; *see also* SSR 16-3p, 2016 SSR LEXIS 4, at *18-19.

The ALJ failed to apply proper legal standards in his evaluation of Fyffe's fibromyalgia

symptom complaints.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  For context, it is worth

noting what Fyffe's claimed limitations stemming from her fibromyalgia were: (i) dropping

things due to tingling in her hands (Tr. 264-66, 1389-90); (ii) disabling pain as a result of flare-

ups lasting up to 48 hours up to 3 times per month (Tr. 265, 1382); and (iii) fatigue, resulting in a

need to take an extra break at work and two-hour naps at home (Tr. 267, 1381, 1384, 1387).[3]

The ALJ's RFC findings did not include manipulative, exertional, or off-task limitations

associated with Fyffe's claimed functional limitations.  *See* (Tr. 1350).  The ALJ's reasons were

that Fyffe's indicated limitations were: (i) inconsistent with some of Fyffe's activities of daily

living; and (ii) inconsistent with numerous "unremarkable" objective exam findings.  (Tr. 1355-

56).

Neither party disputes that objective exam findings are an improper basis upon which to

discount fibromyalgia symptom complaints.  Indeed, the Sixth Circuit has described the lack of

corroborative objective findings as "basically irrelevant" in the context of analyzing

---

[3] Because Fyffe has not challenged the ALJ's rejection of her fibro-fog symptoms, the court does not
address that portion of the ALJ's analysis.  *See Caudill v. Hollan*, 431 F.3d 900, 915 n.13 (6th Cir. 2005).

fibromyalgia symptoms.  *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 864 (6th Cir. 2011); *see also Canfield v. Comm'r of Soc. Sec.*, No. 01-CV-73472, 2002 U.S. Dist. LEXIS 18921, at *4 (E.D. Mich. Sept. 13, 2002) ("It is … nonsensical to discount a fibromyalgia patient's subjective complaints on the grounds that objective medical findings are lacking.").  It bears mention that the ALJ's collection of the many "unremarkable" exam visits did not also include the many visits summarized above at which specific fibromyalgia-related findings were made.  For example, the ALJ did not cite a single exam visit at which Fyffe was found to have 18/18 trigger points.  In fact, the ALJ only used the term "trigger points" twice in his entire decision and then only to indicate that Fyffe was found to have no trigger points on those two visits.  (Tr. 1354, 1358).

The Commissioner denies, however, that the ALJ relied on objective exam findings in his fibromyalgia analysis, arguing that "it is clear [that] the ALJ was analyzing all of [Fyffe's] physical impairments … and not simply her fibromyalgia."  ECF Doc. 15 at 7.  The court disagrees.  If the ALJ had been analyzing all of Fyffe's impairments together, then he would have necessarily used the objective exam findings cited to also analyze the severity of Fyffe's fibromyalgia symptoms.  Further, the ALJ expressly stated in his summary of his RFC analysis that the "physical examinations do not reflect the degree and frequency of pain one would expect based on her testimony."  (Tr. 1357).  And the ALJ partly discounted Dr. Fox's opinion based on a lack of corroborative objective exam findings.  (Tr. 1358-59).  The Commissioner cannot escape the ALJ's own reasoning for why he rejected the severity of Fyffe's fibromyalgia symptoms.

The ALJ's reliance on objective exam findings is not reversible error, however, if the ALJ otherwise complied with the requirements of SSR 12-2p by analyzing the relevant

regulatory factors and giving adequately supported reasons for his conclusion.  *See Swain*, 297 F. Supp. 2d at 990; SSR 12-2p, 2012 SSR LEXIS 1, at *14.  But as will be discussed below, the ALJ's other reasons also constituted a failure to apply proper legal standards.

As activities of daily living inconsistent with Fyffe's alleged symptoms, the ALJ highlighted her: (i) ability to do part-time work; (ii) ability to walk her dog, make coffee, fix breakfast, and grocery shop; (iii) statements to providers of her exercise; (iv) statements to providers of her hobbies; and (v) her repeated reports of full-time work during the period under adjudication.  (Tr. 1355).

Fyffe's ability to do part-time work, as the Commissioner correctly points out, is relevant to the ALJ's analysis.  *Miller v. Comm'r of Soc. Sec.*, 524 F. App'x 191, 194 (6th Cir. 2013). But the RFC determination is an assessment of the most a claimant can do "8 hours a day, for five days a week, or an equivalent schedule."  SSR 96-9p, 1996 SSR LEXIS 6, at *3.  Fyffe's ability to work up to 3.5 hours per day, 5 days per week is not inconsistent with her testimony that she could not work a greater number of hours because of her chronic pain, or that she took more than the allotted number of break periods, or that she requested time off at least once pre week, or that she required the assistance of her coworkers on bad days.  That Fyffe can mop, sweep, and carry cat litter during those 3.5 hours does not equate to the ability to do so, as the ALJ's RFC finding implied, 8 hours per day.

Fyffe's activities of daily living were also relevant.  *See* SSR 12-2p, 2012 SSR LEXIS 1, at *14.  But the activities of daily living to which Fyffe testified did not necessarily equate to the ability to work full time.  *Cf. Kalmbach*, 409 F. App'x at 864 (finding that the claimant's testimony that she could grocery shop, go to the pharmacy, attend church, prepare meals, dress herself, and drive 30 minutes per day were "hardly consistent with eight hours' worth of typical

work activity"); *Rogers*, 486 F.3d at 248-49 (concluding similarly with respect to claimant's testimony that she could drive, clean, care for two dogs, do laundry, read, do stretching exercises, and watch the news). This is especially so given Fyffe's testimony of the quality of her activities of daily living closer to her date last insured: (i) she did *some* cleaning on her one day off; (ii) she did *not* do laundry or grocery shop; and (iii) after work she did nothing but rest. (Tr. 1381-82, 1386-87).

The ALJ's reliance on Fyffe's reported exercise regimen through July 2016 was relevant to the alleged severity of Fyffe's symptoms at that time. (Tr. 1355). And it could serve as evidence with which the ALJ could contrast Fyffe's subjective symptom complaints at the 2016 ALJ hearing. But the ALJ determined that Fyffe last met the insured status requirements through June 30, 2021, extending the period under adjudication to the date of the ALJ's decision (February 4, 2020). (Tr. 1345, 1363). It is not clear, then, why Fyffe's ability to exercise through July 2016 would render inconsistent Fyffe's statements in December 2019 that she required more breaks than those allotted, or that she was forced to call off work once per week, or that she needed occasional assistance with carrying and lifting. Nor would the bare fact that Fyffe went camping once in July 2019 contradict the severity of her reported symptoms. *See Keller v. Comm'r of Soc. Sec.*, No. 2:18-cv-341, 2019 U.S. Dist. LEXIS 12829, at *24-25 (S.D. Ohio Jan. 28, 2019) ("That Plaintiff tried to keep active is not a basis to discount her statements regarding her subjective complaints of [fibromyalgia] pain.").

And the ALJ's finding that Fyffe consistently reported working during the relevant period is not entirely accurate. That conclusion appears to be based on treatment notes from MetroHealth repeatedly noting that Fyffe was working full-time as a machine operator. (Tr. 1354). But Fyffe testified that she quit that job in 2014 and her earnings reports indicated that

she stopped receiving income from that job after 2013.  (Tr. 1528-31, 1538-40).  A closer inspection of the treatment notes upon which the ALJ relied indicates, rather, that they reflected Fyffe's reported work and functional limitations when she first sought treatment with Dr. Fox in February 2013.  *See* (Tr. 1115-17, 1216-17, 1815-17, 1823-25, 1836-38).

What's left is Fyffe's part-time work as a leasing agent, office clerk, and veterinarian technician.  But as discussed above, Fyffe's ability to work part-time (between 19 and 25 hours per her testimony) is not inconsistent with her testimony that she could not work a greater number of hours.  Nor would it be inconsistent with her need take extra breaks or time off or receive help to do her work from coworkers.  *See* (Tr. 1370).

The Commissioner appears to argue that any error in the ALJ's evaluation of Fyffe's fibromyalgia symptom complaints was harmless because Fyffe has not pointed to evidence warranting greater restrictions in the RFC.  But the alleged error is not what more the ALJ should have found but whether the manner in which the ALJ arrived at his conclusion complied with the regulations and was sufficiently articulated.  It is clear that the ALJ found Fyffe's fibromyalgia symptom complaints inconsistent with the record evidence.  The reasons the ALJ gave to support that conclusion, however, failed to build an accurate and logical bridge between the *relevant* evidence and the result.  *Fleischer*, 774 F. Supp. 2d at 877.  That was a failure to apply proper legal standards that warrants a remand for further consideration.  *See Keller*, No. 2:18-cv-341, 2019 U.S. Dist. LEXIS 12829, at *28-29.

### C.      Dr. Fox's Opinion

Fyffe argues that the ALJ failed to apply proper legal standards or each a decision supported by substantial evidence when he gave less than controlling weight to the opinion of Dr. Fox.  ECF Doc. 13 at 14-17.  Fyffe argues that the ALJ could not discount Dr. Fox's opinion

based on the lack of corroborative objective testing.  ECF Doc. 13 at 14-16.  And she argues that the ALJ's analysis of Dr. Fox's opinion was otherwise flawed in the context of fibromyalgia. ECF Doc. 13 at 14.

The Commissioner responds that the ALJ gave "good reasons" for giving less than controlling weight to Dr. Fox's opinion.  ECF Doc. 15 at 8-13.  The Commissioner argues that it was proper to discount Dr. Fox's opinion: (i) for lack of support in his treatment notes because Fyffe reported working full-time; (ii) as inconsistent with the opinion of the state agency consultants; (iii) for lack of any evidentiary support with respect to Fyffe's fibro-fog symptoms; and (iv) for lack of supporting explanation.  *Id.*

The regulations in place at the time Fyffe filed her application required the ALJ to give controlling weight to a treating physician's opinion unless he can articulate "good reasons" for discounting it.  20 C.F.R. § 404.1527(c); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).  Generally, "good reasons" include that the opinion: (1) wasn't "supported by medically acceptable clinical and laboratory diagnostic techniques"; or (2) was inconsistent with other medical evidence in the record.  20 C.F.R. § 404.1527(c)(2); *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 786 (6th Cir. 2017).  In in the context of fibromyalgia, the lack of corroborative objective findings is not a "good reason" for rejecting the opinion.  *See Kalmbach*, 409 F. App'x at 861-62; *see also Madinger v. Comm'r of Soc. Sec.*, No. 09-2076, 2019 U.S. Dist. LEXIS 176900, at *17 (S.D. Ohio Oct. 11, 2019).

If the ALJ decides to discount a treating physician's opinion, he must then proceed to articulate what ultimate weight that opinion received based on several regulatory factors. *Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2)-(6).  Those factors include: (1) the length and frequency of treatment; (2) the supportability of the opinion; (3) the consistency of the

opinion with the record as a whole; (4) whether the treating physician is a specialist; (5) the physician's understanding of the disability program and its evidentiary requirements; (6) the physician's familiarity with other information in the record; and (7) any other factor the ALJ might find relevant. *Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2)-(6). The regulations don't require the ALJ to specifically discuss any particular factor. 20 C.F.R. § 404.1527(c); *Biestek*, 880 F.3d at 786 ("The ALJ need not perform an exhaustive, step-by-step analysis of each factor."). But if the ALJ's explanation isn't sufficient to explain the ultimate weight given to the opinion or otherwise fails to give "good reasons" for discounting the opinion, remand is appropriate. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009) (holding that the failure to identify good reasons affecting the weight given to an opinion "'denotes a lack of substantial evidence, even whe[n] the conclusion of the ALJ may be justified based upon the record.'" (citing *Rogers*, 486 F.3d at 243)).

The ALJ failed to apply proper legal standards in his evaluation of Dr. Fox's opinion. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. The ALJ stated that he gave less than controlling weight to Dr. Fox's opinion because: (i) it was inconsistent with Fyffe's statements to Dr. Fox that she was working full-time and that her fibromyalgia was stable; (ii) it was not corroborated by objective exam findings; (iii) Fyffe's fibro-fog symptoms lacked evidentiary support and were inconsistent with Fyffe's behavior at the hearing; (iv) Fyffe's alleged absenteeism was inconsistent with her reported activities of daily living; and (v) it was inconsistent with the opinion of the state agency consultants. (Tr. 1359-60). Most of these reasons were problematic, beginning with those used to discount Dr. Fox's opinion of Fyffe's absenteeism.

As stated above, the portions of the treatment notes indicating that Fyffe was working full-time as a machine operator referred to Fyffe's work when she first sought treatment with

Dr. Fox in 2013.  That Fyffe worked as a machine operator in 2013, therefore, was not inconsistent with Dr. Fox's 2016 opinion that it would be difficult for Fyffe to work full-time because of her chronic pain and fatigue.  And that Fyffe reported herself to be stable half a year before Dr. Fox's opinion is not inconsistent with his opinion, given the waxing and waning nature of fibromyalgia, Fyffe's contemporaneous reports of fatigue and pain, and numerous positive trigger point tests.  (Tr. 1081, 1115, 1139, 1183, 1193-94, 1215-16); *see* SSR 12-2p, 2012 SSR LEXIS 1, at *3-6, 17.

Reliance on a lack of corroborative exam findings to discount a treating source's opinion is, and it bears repeating, "basically irrelevant" and represents a "fundamental misunderstanding [on the part of the ALJ] of the nature of fibromyalgia." *Kalmbach*, 409 F. App'x 861, 863.  Of note is the ALJ's reliance on the fact that fibromyalgia was not listed as among the diagnoses assessed on November 20, 2017, March 22, 2018, and May 30, 2018.  (Tr. 1359).  It is not clear why the ALJ found that absence remarkable when Fyffe was prescribed medication at each of those visits specifically for her fibromyalgia.  *See* (Tr. 1799, 1831, 1844 (refilling Lyrica and Zanaflex prescriptions)).  And Fyffe continued to be diagnosed with fibromyalgia during the same period and at other follow-up appointments.  *See* (Tr. 1598, 1859, 1868, 1877, 1890, 1980). Remarking on the absence of a diagnosis would also be inconsistent with the ALJ's own finding that fibromyalgia was a severe impairment, which implied a finding that Fyffe had a medically determinable impairment of fibromyalgia during the relevant period.  *See* 20 C.F.R. § 404.1521; (Tr. 1346).

The activities of daily living the ALJ cited, which were the same the ALJ used to discount Fyffe's fibromyalgia symptom complaints, were, for the same reasons discussed above, not inconsistent with Dr. Fox's opinion on Fyffe's absenteeism or difficulty with full-time work.

*See* (Tr. 1360 (citing Fyffe's reports that she exercised at the gym three times per week and did home exercises, such as stretching and using a stationary bike)); *see also Cross v. Colvin*, No. 15-cv-331, 2016 U.S. Dist. LEXIS 57985, at *22 (D. N.H. Apr. 4, 2016) ("The mere fact of going to the gym, even five days a week, when reported without any consideration of what, exactly [the claimant] was doing at the gym, does not appear to evidence a reasonable mind might accept as adequate … ." (citation omitted)).  And Fyffe's self-report that she was "pleased with her progress and planned on going on a trip" was made in the context of following up with Dr. Belding on her leg pain.  (Tr. 1741).  The statement would not necessarily be inconsistent with Dr. Fox's opinion of Fyffe's absenteeism because of chronic pain from her fibromyalgia.

The ALJ could rely on the inconsistency between the state agency consultants' and Dr. Fox's opinions as a basis for discounting Dr. Fox's opinion.  *Blakely*, 581 F.3d at 409.  But the reason given by the ALJ to give greater weight to the opinion of the state agency consultants was that their opinion was generally consistent with unremarkable objective exam findings and diagnostic testing.  (Tr. 1357-58).  The opinion of the state agency consultants was based solely on a review of the objective evidence.  The ALJ could not credit their opinion on the functional limitations attributable to Fyffe's fibromyalgia over that of a treating source solely on the basis that their opinion is more consistent with the objective evidence.  *See Rogers*, 486 F.3d at 245 ("[I]n light of the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia, opinions that focus solely upon objective evidence are not particularly relevant."); *see also Norris v. Comm'r of Soc. Sec.*, No. 1:17-cv-587, 2018 U.S. Dist. LEXIS 158159, at *22-23 (S.D. Ohio Sept. 17, 2018).

The only portion of Dr. Fox's opinion for which the ALJ gave "good reasons" for discounting was his opinion on Fyffe's concentration limitations.  The ALJ discounted that

26

portion of Dr. Fox's opinion because: (i) it appeared based on Fyffe's own allegations, which were inconsistent with her own subjective reporting and objective exam findings throughout her treatment history; and (ii) Fyffe demonstrated no such deficits at the hearing.  (Tr. 1359).  The ALJ properly relied on the inconsistency between the opinion and Fyffe's subjective reporting. And that reasoning was supported by substantial evidence, as Fyffe did not report to providers issues with her concentration or symptoms of fibro-fog.  *See* (Tr. 1346, 1356, 1359).  And the ALJ could rely on his observations at the ALJ hearing as a factor in his analysis.  *E.g.*, *Brock v. Comm'r of Soc. Sec.*, 638 F. App'x 622, 625 (6th Cir. 2010); *Johnson v. Comm'r of Soc. Sec.*, No. 99-1438, 210 F.3d 372, [published in full text format at 2000 U.S. App. LEXIS 5248] *14 (6th Cir. 2000); *Martin v. Sec'y of Health and Hum. Servs.*, 735 F.2d 1008, 1010 (6th Cir. 1984). But the ALJ's reason for discounting Dr. Fox's opinion as to Fyffe's concentration limitations cannot independently sustain the ALJ's decision to reject his opinion on Fyffe's absenteeism or difficulties with full-time work.

The ALJ gave a lengthy discussion of the reasons why he did not assign controlling weight to the opinion of Dr. Fox.  But most of those reasons failed to comply with the regulations as it pertains to an analysis of fibromyalgia.  The errors in the ALJ's analysis of Dr. Fox's opinion compound those of the ALJ's analysis of Fyffe's subjective symptoms complaints.  Therefore, the court finds a remand appropriate for the ALJ to reconsider both issues and issue a new decision.[4]  The court recommends that the Commissioner assign the matter to a different ALJ upon remand inasmuch as the one who has heard Fyffe's case thus far has been remanded twice.

---

[4] Because the Commissioner has not argued that any error in the ALJ's analysis of Dr. Fox's opinion was harmless, the court will not do so either.  *E.g.*, *Abram v. Comm'r of Soc. Sec.*, No. 2:17-cv-625, 2018 U.S. Dist. LEXIS 36957, at *30 (S.D. Ohio Mar. 7, 2018); *Johnson v. Comm'r of Soc. Sec.*, No. 2:14-cv-306, 2015 U.S. Dist. LEXIS 19175, at *21-22 (S.D. Ohio Feb. 18, 2015).

## IV.    Conclusion

Because the ALJ failed to apply proper legal standards in his evaluation of Fyffe's

fibromyalgia symptom complaints and opinion of Fyffe's treating physician, the Commissioner's

final decision denying Fyffe's application for DIB is vacated and Fyffe's case is remanded for

further consideration.

**IT IS SO ORDERED.**

Dated: June 16, 2022

                                    Thomas M. Parker
                          United States Magistrate Judge

28